NEWCOMB, County Judge, Respondent, vs. INGRAM and others, Appellants.

*June 2—June 20, 1932.*
*January 13—April 11, 1933.*

*Farr & MacLeod* of Eau Claire, for the appellant Charles A. Ingram.

For the appellants Hurlburt and Ward there were briefs by *Bundy & Bundy* of Menomonie, and oral argument by *R. E. Bundy* and *Wm. H. Bundy*.

For the appellants Nicklas as executor and Samuel B. Ingram there were briefs by *W. E. Thurston* of Durand, *W. G. Haddow* of Ellsworth, and *H. W. Rudow* of Menomonie, and oral argument by *Mr. Rudow*.

*Bundy, Beach & Holland* of Eau Claire, for the appellant Fidelity and Deposit Company of Maryland.

*Fred Arnold* of Eau Claire, for the respondent.

The following opinion was filed June 20, 1932:

FOWLER, J. This case is a sequel to that of *Will of Leonard*, 202 Wis. 117, 230 N. W. 715, wherein Charles A. Ingram as executor and trustee was adjudged on accounting to pay $16,667.17 to Frank E. Leonard and Roy Leonard, as remaindermen upon termination of a life estate to the widow of the testator. For a statement of evidentiary facts indirectly involved in addition to those herein stated, we refer to the opinion in that case. This suit is founded on the judgment finally entered in that case. In the course of his handling of the estate Ingram gave three consecutive bonds, each running to the county judge, and on the entry of that final judgment this suit was brought by the county judge for the benefit of the remaindermen.

The first bond, on which Henry Goodrich and M. Hurlburt were sureties, was dated March 1, 1906, was in the penal sum of $15,000, and was conditioned upon Ingram's performance of his duties as executor. The next, on which the Fidelity and Deposit Company of Maryland was surety, was dated September 6, 1907, was in the penal sum of $20,000, and was conditioned upon Ingram's performance of his duties as trustee. The last, on which S. B. Ingram and E. Oesterreicher were sureties, was dated January 23, 1917, was in the penal sum of $20,000, and was conditioned upon Ingram's performance of his duties as executor and trustee. The trial court held that the sureties on all the bonds were each liable to the extent of the penal sum for the

whole amount adjudged due from Ingram, and that the different sureties should contribute to payment of the judgment in the proportionate amount to which the penal sum of the bond on which they were liable bore to the total of the penal sums.

(1) The bondsmen on the first bond, given as executor, claim that their liability is only for the conduct of Ingram as executor, and that Ingram ceased to act as executor when the second bond, given as trustee, was approved by the court. Under the facts here involved this contention cannot be upheld. "The executor's liability continues until the estate is fully administered, and the sureties' as well." The liability of both principal and surety continues until there has been a final accounting as executor. *Kellogg v. Stroud,* 166 Wis. 12, 17, 163 N. W. 261, and cases cited. Ingram never submitted any final account as executor, or any other account for that matter, until the proceeding was had upon which the judgment herein sued upon was based. Nor was any order ever made assigning the property held by Ingram as executor to Ingram as trustee. When an executor is also made a trustee, his functions, duties, and liabilities as executor do not cease until his final account as executor is fully settled and the estate fully administered. *Wallber v. Wilmanns,* 116 Wis. 246, 93 N. W. 47.

(2) The sureties on the first bond contend that the liability of Ingram was increased by agreement between him and the parties interested in the estate and that this relieved them from responsibility under the familiar rule applicable to sureties on bonds or other contracts given in ordinary business transactions. We consider that this rule is not applicable to the instant case because it was beyond the power of the beneficiaries to increase the liabilities of Ingram as executor. His liabilities as executor are fixed by law, and his obligation as executor is to account for funds and property coming into his hands as executor. It is true that,

pursuant to arrangement between the parties interested in the estate, land was sold and the proceeds of the land came into his hands, and his liability to the parties was thereby increased. But this was a personal liability, not a liability as executor. The will did not give Ingram power to sell any land. No occasion to sell land to pay debts or expenses of administration arose. Under these circumstances his only liability as executor was to account for such personal property as came into his hands as executor, and that liability was no more increased by his acquiring funds through sale of lands through agreement of the parties than it would have been had he incurred liability to the parties for borrowing money from them.

(3) It is contended by the sureties on the executor's bond that the second bond was given to replace the first, and that the mere filing and approval of the second bond operated to release them from their obligation under the first bond. In *Richter v. Estate of Leiby,* 101 Wis. 434, 77 N. W. 745, a second bond was given by a trustee with the express purpose and intention of supplanting a prior bond given as trustee and releasing the sureties thereon. It was held that "county courts, in absence of express statute (as now exists in sec. 4281*b*, Stats. 1898), have no power, either by taking a new bond or otherwise, to discharge sureties from liability for either past or prospective misconduct of an executor, administrator, or trustee, and that the taking of the new bond . . . did not release or discharge . . . [the surety on the earlier bond], but was merely cumulative." Sec. 4281*b*, Stats. 1898, continued in force until 1919, when by ch. 655, Laws of 1919, a statute practically the same as the present sec. 204.15 (5) was substituted for it. But although sec. 4281*b* was in force at the dates on which the two later bonds herein involved were executed, there was no compliance or attempt to comply with the statutory conditions for

procuring a substitution and release, and in absence of such compliance the liability of the executor continued as if no statute existed. Under the rule of the *Leiby Case,* the contention here under consideration cannot be upheld.

(4) It is contended by the surety on the second bond that the bond signed by it only obligated it to be responsible for Ingram's conduct as a trustee appointed by and subject to the control of the court; that the will did not create a trust, and the county court is without jurisdiction to appoint a trustee except a trust be created by will; and that the order appointing Ingram as trustee is therefore void and their bond is void and they are in no wise accountable for his misconduct. The provision of the will claimed by respondent to have created a trust is the second paragraph which left "the sole use, benefit and control" of all the testator's property to his wife during her life; provided that she should have the "exclusive control and management thereof and the income therefrom for her support;" and provided that if the income thereof should not prove sufficient for her support she should have "the right and power to sell and dispose of such amount thereof" as should be necessary therefor. The third paragraph devised and bequeathed to the testator's sons the property remaining at the wife's death. These paragraphs merely created a life estate in the widow with remainder over to the sons. They did not create a trust estate, and the jurisdiction of the county court to administer trusts or appoint trustees is limited to trusts created by will. Sec. 253.03, Stats.

The county court is a court of limited jurisdiction. It was held in *Crawford County v. Le Clerc,* 3 Pin. 325, 327, that the county courts, "being mere creatures of the statute, have no powers except such as are derived from the statute, and it must appear upon the face of their proceedings that they acted within the powers granted. If this does not

appear, all they do is *coram non judice* and void." This is cited with approval in *Estate of Anson,* 177 Wis. 441, 188 N. W. 479, and *Guardianship of Figi,* 181 Wis. 136, 139, 194 N. W. 41. We are of opinion that the county court was without jurisdiction to appoint a trustee in the instant case. Such trust as was created was created by the acts of the parties, the widow and the sons of the testator, who agreed among themselves that Ingram should retain possession and manage and conserve the estate for the benefit of all the parties.

It is contended by the respondent that the surety on the second bond is estopped from attacking the validity of his appointment as trustee, and 24 Corp. Jur. p. 1093, § 2623, is cited in support of this contention. The paragraph cited relates to executors and administrators, and examination of the cases cited in support of the text shows that in no case was the court without jurisdiction of the subject matter. The paragraph refers to appointments that are voidable, not to those which are void. "Where the probate court is a court of limited jurisdiction a lack of jurisdiction may be shown collaterally. The appointment may be attacked collaterally when the record affirmatively shows that the court granting the letters acted without jurisdiction, and indeed any appointment which is void, as distinguished from voidable merely, may be collaterally attacked." 23 Corp. Jur. p. 1089, § 247. It is fundamental that any order or judgment may be collaterally attacked that is void for want of jurisdiction of the court of the subject matter of the action. *Mathie v. McIntosh,* 40 Wis. 120; *Rape v. Heaton,* 9 Wis. 301, *328; *Melia v. Simmons,* 45 Wis. 334; *Guardianship of Reeve,* 176 Wis. 579, 186 N. W. 736; *Wanzer v. Howland,* 10 Wis. 8.

However, although the order appointing Ingram as trustee is void it does not follow that the bond is void. It was given as a statutory bond in conformance with sec.

323.01, Stats., and as a statutory bond would not support an action against the bondsman, but if it is good as a common-law bond, action upon it lies. The case of *Dudley v. Rice,* 119 Wis. 97, 95 N. W. 936, not only supports this proposition but it makes the bond in suit valid as a common-law bond. In that case the bond sued upon was given as a guardian's bond. The order appointing the guardian had finally been held void for want of jurisdiction on motion to vacate it made to the court that made the appointment. In suit on the bond the court held that as the order of appointment was void the bond was void as a statutory bond and would not support an action as such, but that it was valid as a common-law bond and as such would support the suit. The bond was held good as a common-law bond because by its terms it bound the principal to settle his account with the court "or with the ward if she be of sound mind." As the ward was of sound mind the sureties were held responsible for his failure to account to her. In the instant case we have a similar provision. The condition of the bond is that the principal shall "adjust and settle his accounts with such (the county) court at the expiration of his trust and *pay and deliver to the person or persons entitled thereto all balances, money, and property in his possession and for which he is liable as trustee."* The bond in suit by its terms bound the principal to pay to the remaindermen the funds held by him as trustee, and the principal was a trustee by act of the widow and remaindermen although not by order of the court, and the sureties are responsible for his default in that respect.

(5) The sureties on the second bond also contend that the giving of the third bond released them, and urge in addition to the argument of the sureties on the first bond in support of their contention that taking the second bond discharged them from liability, that the county court made an order expressly releasing them from liability. It does

not appear that such an order was made in the *Leiby Case, supra,* but under the rule of that case, if it were assumed that the county court properly appointed Ingram as trustee, the county court had no power to discharge the sureties on the second bond except upon compliance with sec. 204.15, Stats., and that statute was not complied with. If it be assumed that the bond was a common-law bond, the county court certainly had no jurisdiction to discharge the surety. So however the bond is considered the order of the county court purporting to discharge the surety is void. The remaindermen had no part in procuring the order of discharge and did not consent that the surety should be discharged. In any view of the case we are of opinion that the surety continued bound.

The second bond not being valid as a statutory bond, the reason on which the liability of the sureties on the executor's bond is held to continue after the execution of the second bond does not apply. And it is doubtless true that the parties in interest under a common-law bond may by agreement between themselves relieve the sureties by substituting another bond with intent thereby to relieve them. But the remaindermen are the parties for whose protection the second bond was given, and they did not agree or consent to or know anything about the giving of the third bond, and the principal and surety could not by agreement between themselves relieve the surety. The liability of the surety on the second bond therefore continued notwithstanding the execution of the third bond.

(6) The surety on the second bond also contends, as did those on the first bond, that by selling the land and leaving the proceeds in Ingram's hands, the principal and the parties interested in the estate by agreement between themselves increased the liability of the principal and it is thereby released from liability on the bond as a common-law bond. The so-called "letters of trust" issued to Ingram by the

county court, although void, measure the extent of Ingram's liability as trustee created by the act of the parties in interest. It provides that Ingram shall "reinvest in good and sufficient securities . . . all moneys which may accumulate or *be derived from the estate.*" This provision conforms to the petition of the parties pursuant to which the letters were issued. It thus appears that it was originally contemplated by the parties creating the trust that Ingram was to be a trustee of all moneys derived from the estate and the sale price of the lands was so derived. There was thus no subsequent increase of the liability originally assumed by the trustee. The receipt of the sale price of the land therefore did not operate to discharge the surety from its bond.

(7) The sureties on the two later bonds contend that they are released because the persons interested in the estate agreed among themselves that the widow should receive, instead of the entire income of the estate as the will provided, $100 and later $65 per month and payments thereafter were made to her upon such basis. Such an agreement was made by the widow in consideration of the remaindermen abandoning a threatened contest of the probate of the will. The claim is that this agreement was void as against public policy under the rule of *Will of Dardis,* 135 Wis. 457, 462, 115 N. W. 332; *Will of Rice,* 150 Wis. 401, 136 N. W. 956, 137 N. W. 778; and *Graef v. Kanouse,* 205 Wis. 597, 238 N. W. 377; and as Ingram was made trustee pursuant to this agreement, the trust and the bond as trustee were void also. It is true that the county court has no jurisdiction to execute an agreement of those interested in a will disposing of an estate contrary to the terms of the will. *Estate of Sipchen,* 180 Wis. 504, 193 N. W. 385. As the court had no jurisdiction as above held to appoint a trustee because no trust was created by the will, it does not make the appointment any more void that it was made pursuant to such an agreement, even if the agreement

was void, or the bond any more void as a statutory bond. However, it is stated in the *Sipchen Case, supra,* p. 512, that although the county court has no jurisdiction to enforce such an agreement, referring to an agreement made after the death of the testator when all the parties know of the contents of the will, "the parties interested . . . have a right . . . to make such disposition of their shares by contract or otherwise as to them may seem proper, and such disposition may be given legal effect by proper proceedings or in an action in a court of competent jurisdiction." But regardless of this, the agreement of the parties in fact made Ingram a trustee independent of court action, and, as above held, the bond of the surety as a common-law bond holds the surety responsible for the trustee's default.

(8) The sureties also contend that if they are responsible at all it is only for Ingram's handling of the estate in accordance with the terms of the will, and they should have credit for such sum as the full net income of the estate exceeded the amounts paid to the widow during her lifetime. This contention is met, as is the one next above considered, by the consideration that the bond as a common-law bond covered the defaults of Ingram as a trustee of whatever funds come into his hands through agreement of the parties independent of the terms of the will or the order of the court.

(9) The above disposes of the contentions of the sureties that they are entirely discharged from liability, but the extent of the liability of the several sets of sureties remains for consideration. We will first take up the liability of the first set. It is mentioned above that funds came into Ingram's hands upon sale of land through an agreement of the parties interested in the estate. The parties all agreed to Ingram's selling the land and holding the proceeds to be handled as the other funds of the estate were handled. But these funds did not come into his hands as executor, and the

sureties on the first bond are only liable for such funds as come into his hands as executor. What is said under (2) above shows that the executor as such was not liable for these funds, and his bondsmen are not liable for his failure to account for them. The judgment below included these funds in the amount for which all the sureties were held responsible. This was error as to the sureties on the first bond. *Forbes v. Allen,* 166 Mass. 569, 44 N. E. 1065, is sufficient authority to cite in support of this position, if any is needed. In that case a trust was created by a will for the benefit of a son of the testator, who was given an additional bequest. The son and the executor of the will arranged that the executor should hold the additional bequest in trust for the son. The sureties on the executor's bond were held not responsible for the failure of the executor to account for the bequest, though held responsible for his failure to account for the original trust fund.

There were also included in the amount for which the sureties on the several bonds were held liable the $4,000 inventoried value of bank stock and the $400 inventoried value of other stock in Ingram's hands. The judgment on which this action is based required manual delivery of this stock to the remaindermen. The stock was produced and tendered in court upon trial of the case. Demand for its delivery was made upon Ingram prior to commencement of this suit and Ingram failed to deliver it. For this breach of his conduct the sureties are responsible, but the tender into court should have been accepted, and the sureties' liability for this breach is limited to the decrease in value of the stock, if any, between the times of the demand and the tender into court. The total judgment for which the sureties on the first and the two later bonds are responsible should be reduced by $4,400 less the amount stated.

(10) The sureties on the second and third bonds contend that their liability should be reduced by the amount

received by Ingram upon sale of the real estate. To this we cannot agree. It is above held that the surety on the second bond is liable on that bond as a common-law bond for Ingram's conduct as trustee of a trust created by the parties as distinguished from a trust created by will. The proceeds of the land came into his hands as a result of the creation of that trust and because he was made by the parties a trustee of those proceeds. We consider that the surety on the second bond is responsible for the return of these funds as well as the others in Ingram's hands. This applies to the sureties on the third bond also, as that bond as a common-law bond binds them for Ingram's conduct as trustee of a trust created by the parties. If they were bound on the bond as an executor's bond only, they would be released to the same extent as the sureties on the first bond.

(11) The extent of the liability of the sureties on each bond is measured by the funds in the hands of Ingram at the time of its execution and what came into his hands thereafter, with the limitation above indicated as to the surety on the first bond given as executor. Thus the liability of the surety on the third bond is limited to the funds in Ingram's hands when the bond was executed and such if any as came into his hands thereafter; the liability of the surety on the second bond is limited to the amount that was in his hands at the time that bond was executed and such if any as came into his hands thereafter, and the liability of the surety on the first bond as executor is limited to the funds that came into his hands as executor. The second bond is cumulative to the first as to the amount of the funds existing at its execution and subsequent acquisitions thereto, and the third to the first, and the second as to the funds existing at the time of its execution and subsequent acquisitions thereto. As to the plaintiff, each surety is liable for the full extent of the liability adjudged against him. The cumulative and continuing features of the bonds pre-

vent full application of the rule contended for by the sureties which obtains in case of successive official bonds, which holds each of the several bondsmen during a period responsible for only such defaults as occurred during the period of the bond on which he is surety, but we are of opinion that it should be applied to the extent of holding each not responsible for defaults that occurred previous to the execution of his bond.

We believe the above covers in a general way the contentions of the parties, although no mention has been made of the manner in which the points have been raised, whether in refusal to receive evidence, in refusal to amend pleadings to state additional defenses, in overruling demurrers to answers, or what not. The record in the case is voluminous. The printed case comprises over 450 pages. The brief of the defendant surety company comprises 125 pages and contains about 125 citations of authority. We believe the case is properly disposed of by well established principles and the few adjudicated cases of this court above cited.

*By the Court.*—The judgment of the circuit court is reversed for further proceedings and final disposition in accordance with the opinion.

The following opinion was filed April 11, 1933:

FOWLER, J. (*on rehearing*). A motion for rehearing was granted and reargument made upon two questions which will be particularly stated later. We will first dispose of some contentions made on the motions for rehearing upon which we did not consider reargument was necessary or would be helpful.

1. The surety on the second bond so confidently asserts that the case of *Conant v. Newton,* 126 Mass. 105, requires us to hold that it is entirely released because the order appointing the trustee was void and this voided the bond also,

that we are moved to further discussion of the point. We need not follow the decisions of the court of a sister state except in case of a statute taken therefrom and construed by its courts before adoption, unless the reasoning on which they are based appeals to us as sound. But as indicated in the original opinion, the case may be differentiated as it was in *Dudley v. Rice,* 119 Wis. 97, 95 N. W. 936, and the bond held good as a common-law bond. Soundness of the *Conant Case* is not questioned in the *Dudley Case,* but differences between the bonds involved were held to render it not in point. It is to be noted that the bond in the *Dudley Case* had been held good as a common-law bond without reference to its particular wording in the case of *Hazelton v. Douglas,* 97 Wis. 214, 72 N. W. 637, for reasons there given and upon authorities there cited. The reasons there given, applied to this case, may be paraphrased as follows: "Ingram was not a testamentary trustee, although a formal order had been made appointing him. It was supposed, however, that he was such a trustee, and Ingram gave his bond and by means thereof retained the possession of $20,000 worth of property. The bond was given voluntarily. It contravened no statute. It was not repugnant to the policy of the law. It induced the retention by Ingram of the entire fortune of the remaindermen. It was, within the rule of a vast number of authorities, a good voluntary bond. To hold otherwise would do rank injustice." A "vast number of authorities" to this general effect are given in 1 Brandt, Suretyship (3d ed.) §§ 31, 32, 33. This justifies the ruling that the second and third bonds are valid as common-law bonds, whether contrary to *Conant v. Newton* or not. The *Conant Case* goes upon the fact that the bond only obligated the principal to account to the court and pay over such sum as the court should adjudge due; that for want of jurisdiction the court could not render a valid ·judgment; consequently

the bond imposed no obligation. In the instant case the bond by its terms obligates the principal not only to account to the court, but to pay over the amount due to the persons entitled thereto. If the one obligation be nugatory, for invalidity of the court's appointment, or want of jurisdiction to settle the account, the other is not. Besides, the sureties had the same benefit of the expressed obligation to account to the court that they would have had had the appointment been valid. Ingram considered the appointment valid; so did the surety; so did the remaindermen. All considered the provision for accounting to the court valid and obligatory. The principal did so finally account and would have accounted to the court at any time the surety or remaindermen moved the court to require him to do so, or the court so required of its own motion. Every motive and inducement to hold the principal faithful to his trust operated that would have operated had the order appointing the trustee been valid. Moreover, as the executor's bond continued in force, Ingram was under legal obligation to account to the court for personal property precisely as required by the terms of the second bond. To release the bondsman merely because the court had no power to require the bond, especially when the bondsman was paid value for execution of the bond, would indeed "do rank injustice."

2. It is also strenuously urged by the surety on the second bond that the agreement between the remaindermen and the widow, alleged in the answer of the surety, by which, in consideration of the remaindermen's not contesting the will, the widow's rights under the will were modified to the advantage of the remaindermen, was void as against public policy, and that this bars action on the bond. This point was made in the original briefs and the contention considered and rejected by the court without much mention of it in the opinion filed. It should perhaps be said further

upon the point that if such agreement was in fact made it was fully carried out by the parties to it. The county court admitted the will to probate and so administered the estate as to give effect to the agreement without any party to it raising the point of illegality, and final judgment has been entered in the administration proceedings. If it be conceded that the agreement was made and that the widow might have avoided it, the fact remains that she did not do so. As she did not choose to avoid the agreement it is not perceived how any one else except the other parties to it can do so. It is a general proposition, supported by many decisions, that a third person cannot assert the defense of illegality, whether the illegality be based upon violation of public policy or any other ground. 13 Corp. Jur. p. 508, § 458. The situation is as if the agreement were that if the remaindermen would forego contesting the will they would transfer their interest in the estate to the widow upon payment by her to them of a specified money consideration and the agreement had been fully carried out by the parties. In such case had the remaindermen executed warranty deeds and a title guaranty company had guaranteed the title and the title had failed, it would hardly be contended that the company could escape liability under its guaranty because of the illegality of the antecedent agreement. As said in *Farmers' & Millers' Bank v. Detroit & M. R. Co.* 17 Wis. \*372, 376, in holding the railway company to its contract for transportation although the goods were illegally purchased:

"The contract . . . which is the subject of this action (here the bonds), in itself considered, is lawful and innocent. . . . The vice, if any, is farther back, and relates to the source of the title, or the manner of acquiring it."

So here, the vice, if any, is farther back, and relates to the manner in which the situation arose which led to the company's execution of its bond. The company was in no

wise prejudiced by the fact that the occasion for the giving of its bond arose through an illegal contract. As above stated, Ingram was subjected to precisely the same motives and inducements for keeping his trust that would have existed had the occasion arisen through circumstances entirely free from vice. Precisely the same reasons exist for holding the bondsman that existed in the cases wherein a shipment of goods was involved which was acquired in or shipped pursuant to an illegal contract. This did not affect the carrier's liability under its contract for transportation. The same reason exists for not allowing the bondsman to avoid its contract that exists for not allowing the heirs of a deceased person to rescind a contract of the decedent on the ground of·fraud which the decedent did not see fit to rescind during his lifetime (*Zartner v. Holzhauer,* 204 Wis. 18, 234 N. W. 508) ; and that exists for not allowing one sued for wrongfully procuring a third person to breach his contract, to defend on the ground that the contract was void as against public policy. *Northern Wis. Co-op. Tobacco Pool v. Bekkedal,* 182 Wis. 571, 197 N. W. 936.

3. Some of the contentions made by the sureties on the first bond on the motion for rehearing may be disposed of by saying that they cannot be raised in this case, which is a suit on the bond given by Ingram as *executor* which was breached by the failure of Ingram to pay and deliver according to the judgment of the circuit court settling Ingram's account as executor entered pursuant to directions of this court in the case of *Will of Leonard,* 202 Wis. 117, 230 N. W. 715. That judgment required Ingram as executor to pay certain sums and deliver certain property on settlement of his account as executor. That judgment finally determined Ingram's liability as executor, and the bondsmen for his conduct as executor are bound by it to the same extent as Ingram. *Wallber v. Wilmanns,* 116 Wis. 246,

93 N. W. 47; *Meyer v. Barth,* 97 Wis. 352, 72 N. W. 748. They are therefore bound to pay the sum adjudged due and to deliver the property adjudged to be delivered by that judgment. They are not entitled to a new trial on the settlement of the executor's account. If items were included in that account for which the executor was not properly chargeable as executor, the contest over those items either was or should have been made in that suit and cannot be made herein. It follows that the sureties on the first bond are bound to pay according to that judgment. The statement made in paragraph (9) of the original opinion that the sureties on the executor's bond were not liable for the amount received by Ingram on the sale of real estate, while correct as an abstract proposition, cannot be taken advantage of herein, because the former judgment precludes that contention. This is also true as to funds, if any, invested by Ingram at the direction or request of the remaindermen.

4. We are of opinion also that (3) holds as to the sureties on the third bond which was given by Ingram as executor. The condition of the third bond was that Ingram should "truly account as executor . . . as required by law." Where successive bonds are given by an executor and the condition of the later bond is that the executor will do and perform all acts that may be required of him by law, the sureties are liable for the loss following any defalcation, conversion, or devastavit of the executor whether committed before or after the giving of it. 2 Woerner, Law of American Administration (3d ed.) p. 841. The condition above quoted, that the executor "shall truly account as executor as required by law," required Ingram to account for *all* he had received and brings the third bond given by Ingram within the rule stated.

This requires us to modify the statement made in paragraph (11) of the original opinion herein that "The extent of the liability of the sureties on *each* bond is measured by

the funds in his hands at the time of its execution and such as may come into his hands thereafter. Thus the liability of the sureties on the third bond is limited to the funds in Ingram's hands when the bond was executed and such if any as came into his hands thereafter." This statement is not true as to the third bond as an executor's bond. It is according to the general rule as stated by Woerner, *supra,* except where, as here, the terms of the bond require other construction.

5. The surety on the second or common-law bond urges that suit on the bond does not lie until the amount due from Ingram as trustee has been judicially determined, and that, as the county court had no jurisdiction to state Ingram's account as a common-law trustee, the judgment in the original suit on which the liability of the parties hereto rests, adjudging the amount due from Ingram as trustee, is void so far as it purports to adjudge liability as trustee, there has been no adjudication of the amount of his liability. The premise that the judgment so far as it purports to determine the amount due from Ingram as trustee is not binding on the trustee is sound. But the conclusion that the suit does not lie until the amount due from Ingram is determined by judgment does not follow, because the condition of the bond is that Ingram shall pay the amount due as trustee. This is a guaranty of payment as distinguished from a guaranty of collection, on which suit may be brought without prior proceedings against the principal. *Schlesinger v. Schroeder,* 210 Wis. 403, 245 N. W. 666; 1 Brandt, Suretyship, p. 241, § 110.

The surety on the second bond urges that the allowance to the widow from the income of the estate was reduced from $100 a month as it was when the bond was signed to $65 a month, and that this increased the liability of Ingram by adding $35 each month to the amount he was to keep invested and thereby released the surety. We consider that

it was immaterial to the surety how the income of the estate should be disposed of between the beneficiaries. They could agree to its disposition among themselves as they saw fit. The obligation of the trustee was to account "at the expiration of his trust and pay and deliver to the person or persons entitled thereto all balances, money, and property in his possession and for which he is liable as trustee." The change in the disposition of the income did not increase the funds which he received as trustee. The bond was given for an annual premium paid, and the statute in force at the time the premiums ceased, sec. 4281b, Stats. 1898, provided a method by which the surety could be released from obligation for future misconduct of Ingram, and it did not see fit to avail itself of the method provided. Under these circumstances we consider that the surety should be held to liability according to the terms of the bond.

6. The surety on the second bond, as above stated, is not bound by the judgment in the original suit because that bond is a common-law bond, conditioned upon Ingram's performance of his duty as trustee, and the county court had no jurisdiction to settle the account of a common-law trustee. It appears that attempt was made below by sureties on the third bond to show that the residuary legatees had received payments from Ingram in addition to those allowed in the original accounting suit. It also appears that counsel for the surety on the second bond requested that all evidence offered by counsel for any defendant be considered as offered by counsel for the others and that the court tacitly assented. Evidence of the kind stated was competent as to the surety on the second bond. In this connection it may be stated that the surety on the common-law bond is not liable for the costs adjudged by the court on settlement of Ingram's account as executor.

The rule stated in paragraph (11) in the original opinion that sureties on successive bonds are each bound only for the funds in the hands of the principal at the date of the

bond and those coming into his hands thereafter, applies to the surety on the second or common-law bond given by Ingram as trustee. However, the date when Ingram began to act as trustee, rather than the date of the bond, fixes the time when his liability as trustee began. He accepted the letters, and must be deemed to have acted as trustee from that time on, and his liability as trustee for the parties began at that date. His bond as trustee is dated ten months later, but the liability of the surety like that of the principal dates from the time the principal begins to act. *School District v. Larson,* 196 Wis. 211, 218 N. W. 847; *Maloney v. McCormick,* 181 Wis. 107, 193 N. W. 966.

7. The surety on the second bond contends in its answer that the remaindermen concealed from the bonding company that Ingram was a trustee by act of the parties and represented that he was a testamentary trustee, and that this operated as a fraud on the company and released it from its bond and it should have been allowed to prove the representation on the trial. It is only material misrepresentations that may avoid a contract. The representation complained of did not operate to the prejudice or disadvantage of the surety. As matter of fact Ingram did finally account to the court and at all times understood he was legally bound to account to the court, and would have so accounted had any move been made to compel him so to account, and was subjected to the same motives and inducements faithfully to perform his trust that he would have been under had he been a testamentary trustee; and he in fact was legally bound as executor to account to the court for personal property precisely as the bond of the trustee obligated him to account.

8. This brings us to the statement of the questions upon which we asked reargument. The first question is: "Assuming that the two later bonds are valid, are the sureties liable for defaults of the principal prior to the date of the bonds upon the principle of" certain cases cited? What we have

said above, although not responsive to the query raised under the cases cited in the question, renders unnecessary further general statement upon this point. The particular liability of the sureties on the first and second bonds has been sufficiently covered. So of the sureties on the third bond as an executor's bond. As to their liability on the bond as a common-law bond, the condition of the bond as trustee is that Ingram should "pay over to the persons entitled thereto upon the termination of said . . . trusteeship all moneys and turn over all other property which he may or shall hold as such trustee." We are of opinion that this language should be construed as if the word "now" were interpolated between the words "may" and "or shall," so as to read "pay over . . . all moneys . . . which he may now (at date of bond) or shall (hereafter) hold as such trustee." This construction frees the sureties on the third bond, as between them and the surety on the second, for misappropriations prior to the date of their bond, but leaves them liable to the remaindermen on their bond as executor for such misappropriations. The exemption from liability for previous defalcations as trustee is based on the language quoted from the bond, and is not to be taken as indicating that a second bond given as trustee does not ordinarily hold the sureties to account for the entire period of trusteeship.

9. The second question on which reargument was asked is: "Assuming that the two later bonds are valid, are the sureties on a prior bond relieved from contribution towards amounts paid by sureties on a later?"

It is contended by the sureties on the first bond that while they are liable on their bond to the residuary legatees, they are not bound to contribute to payments made by sureties on the later ones because, as they claim, the purpose of giving the later bonds was to relieve them from further liability.

(a) As to contribution between the sureties on the two bonds given by Ingram as executor we see nothing to indicate that such was or may have been the purpose. The

later bond was given without reference to the first. Under the rule of *Richter v. Estate of Leiby*, 101 Wis. 434, 77 N. W. 745, and *Rudolf v. Malone*, 104 Wis. 470, 80 N. W. 743, the sureties on one executor's bond will be liable to contribution in case the other set pays more than their proportionate share.

(b) As between the sureties on the first and second bond the situation is different. The question between them is not one of contribution but of indemnity. The first bond was given only for Ingram's acts as executor; the second as surety for his acts as trustee. While the funds and property received by Ingram in the two capacities were the same, and his duty to account therefor was the same, except as to the proceeds of sales of real estate, the sureties on the first bond contend that as soon as Ingram began to act as trustee his obligation to account was primarily that of a trustee, and that consequently he and his sureties are bound to hold harmless the sureties on the first bond. They argue that had the trustee been a different person than the executor, this would necessarily have been the result the moment the trustee received the funds and property from the executor, and that the result must be the same regardless of the fact that the same person was both executor and trustee. They argue that as soon as Ingram received his letters of trust, so called, from the county court, he began to act as trustee, and that from that time the funds and property must be held to have been in his hands as trustee, just the same as they would have been had they been manually turned over by the executor to another person as trustee. Two citations are given in support of this contention but they seem not to bear upon the proposition, and we find none to the point.

The surety on the second bond contends that Ingram in both capacities received and held the same fund and his sureties were imposed with a common liability and that the general principles of contribution apply and require that the sureties on one bond who pay more than the share

attributable to their bond may have contribution from the sureties on the other bond proportionate to the penalties of the bonds. There is no doubt that, where contribution lies between sureties to bonds, they are liable to contribute according to the penalties of the bonds. *United States F. & G. Co. v. Naylor,* 237 Fed. 314; *Jones v. Blanton,* 41 N. C. 115; *Jones v. Hays,* 38 N. C. 502; *Loring v. Bacon,* 3 Cush. (57 Mass.) 465. See, also, note in 76 A. L. R. 909. The cases next above cited also hold that in case of successive cumulative bonds the sureties on the different bonds are liable to contribution.

Counsel for the surety on the second bond make a strong argument in support of their contention that contribution lies between the sets of sureties on the first and second bonds. They point out that the principle of contribution "is founded on principles of equity and natural justice." *Wait v. Pierce,* 191 Wis. 202, 226, 209 N. W. 475, 210 N. W. 822. They say that "The right exists whenever several persons are subjected to a common burden of which one has been compelled to bear more than his just share," and quote:

"It is based on principles of fundamental justice and equity, and of these principles none is more explicit and outstanding than the one that where the situation of the parties is equal and one has borne more than his just share of the common burden he is entitled to contribution from others who have been dealt with more leniently." *Asylum of St. Vincent de Paul v. McGuire,* 239 N. Y. 375, 146 N. E. 632.

In the case of *Estate of Thompson: Edgerton v. Thompson,* 212 Wis. —, 248 N. W. 167, the opinion in which is filed herewith, wherein Edgerton was appointed by the court both executory and testamentary trustee under a will and gave bonds in both capacities but his account as executor was not settled until he was finally called to account in both capacities so that his executor's bond was never discharged, the court holds that the sureties on the bond as trustee were

liable for all funds misappropriated after the bond was given and were primarily liable therefor to the sureties on the executor's bond, although the sureties on the executor's bond continued liable therefor to a trustee appointed to succeed the one first appointed. The bonds involved were both valid as statutory bonds, but the principle applied makes the surety on the common-law bond primarily liable for all funds that came into the principal's hands as trustee although the executor's bondsmen remain liable therefor to the remaindermen under their bond. We are of opinion that the sureties on the first bond will not be liable for contribution to the surety on the second, but that the surety on the second will be liable over to the sureties on the first for funds misappropriated by Ingram after he began to act as trustee in case the latter make good any such misappropriations.

10. The surety on the second bond contends that, as between the sureties on the third bond and itself, the former are primarily bound to make good the amount of Ingram's defalcations because, as it contends, it was understood that the third bond was to supplant the second and that it was discharged by the giving of the third bond. The sureties on the third bond contend that they cannot be held primarily liable to the surety on the second in absence of agreement therefor between the sureties, and that the evidence does not show such an agreement.

It is of course true that if there was an agreement between the sureties on the two bonds that the sureties on the later would assume primary liability for proper handling by Ingram of property and funds during his entire trusteeship, liability would follow according to the agreement. *Rudolf v. Malone, supra.* But the liability of the surety on the second bond given as trustee is fixed by the terms of its bond and no liability will be imposed on it unless an agreement by it to assume it appears from the bond itself or was collaterally entered into. No agreement to become liable to

the surety on the preceding bond as trustee appears from the terms of the third bond, which was the second bond as trustee. The third bond considered as a common-law bond given as trustee has been above construed as covering only defaults of the principal after its date. However, if the surety on the second bond can prove as a fact that the sureties on the third bond expressly agreed to assume primary liability for Ingram's defalcations, prior to the date of their bond, it should be permitted to do so. But such an agreement is not to be inferred from the bond, or the recitals in the county court's void order, or from the recitals of its own application for discharge, if presentation of a petition for discharge to the court can be found. Nor is it to be inferred from all these together.

We believe the above sufficiently covers the contention of the appellants upon their motions for rehearing. The remaindermen have been kept so long out of their deserts that enforcement of the judgment against the sureties on the first two bonds given as executor need not await the settlement of the account of Ingram as trustee. The course adopted in *Scharine v. Huebsch,* 203 Wis. 261, 234 N. W. 358, may be followed.

*By the Court.*—The original mandate is vacated. The judgment of the circuit court so far as it adjudges recovery to the plaintiff against all defendants except the Fidelity and Deposit Company of Maryland is modified to permit the delivery of the bank stock and $400 concrete stock to the remaindermen and reduction of the judgment as indicated in the last paragraph of division (9) of the original opinion, and as so modified is affirmed. As to the defendant Fidelity and Deposit Company of Maryland the judgment is reversed; and the case is remanded for further proceedings in accordance with the opinions.